Case No. 23-1261, et al., IGas Holdings, Inc., et al., Petitioners v. Environmental Protection Agency Ms. Sandifer for the Petitioners, IGas Holdings, Inc., et al. Ms. Brown for the Petitioners, RMS of Georgia, NLC Ms. Buckley for the Respondents Ms. Dawson for the Interpreters May it please the Court, Joanne Sandifer here on behalf of the IGas Petitioners. The IGas Petitioners bring a narrow challenge to EPA's 2024 rule promulgating consumption allowances for hydrofluorocarbons, HFCs, pursuant to the AIM Act. In the AIM Act, Congress reduced the production and consumption of HFCs through a phased step-down that lasted through 2023. EPA initially allocated allowances under this rule in a framework rule for years 2022 and 2023. It based the entity's allocations on their market share, and it determined market share by looking at the entity's highest three years of data between 2011 and 2019, averaged that data, and determined the market share and allocated accordingly. In doing so, it determined this was the most equitable manner of making the allocations. Ms. Sandifer, before you get much further into the merits, could you address the standing to seek relief here? Yes, Your Honor. IGas is one of the entities – IGas and the Petitioners are entities that receive allocations under the EPA rule every year. They are continuing to receive allocations under the rule. They submitted comments in response to the EPA's request for comments. So what would happen in the HFC market and the allocation trading system if we vacated and remanded the 2024 rule for failure to include the 2020 data? Would there be no allocations at all? No, Your Honor, we're not suggesting that. We understand that there's a desire to not disrupt the market. What we're asking for is forward-looking relief. In fact, the 2025 allocations were set just last week on October 1st. We aren't suggesting a change to that. So is it your position that it's just unclear what would be in place in terms of allocations if the rule were to be vacated? Let me address that, Your Honor. First of all, we're not asking you to vacate the entire rule. We're asking you to vacate one very narrow section, 8411B2, that deals with the specific allocation methodology. We understand that it would remain in place for 2025. We aren't suggesting any action be taken because those allocations were set last week. Those would continue in 2025 unaffected. What we're suggesting is that the court should vacate that portion of the rule on a going-forward basis on the grounds that the failure to include the 2020 data was arbitrary capricious and remand for further proceedings before the EPA with respect to the 2026, 27, and 28 allocations, which are all governed by the 2024 rule. Thank you. So to jump to the heart of our challenge here, EPA, in enacting the 2024 rule, asked for comments on whether it should include more recent data. More recent data would have necessarily been limited to 2020 and 2021. That would be the only new available data since it enacted the framework rule. And as I said, enacting the framework rule, the EPA recognized this was the best way to do the allocations, this three-year averaging system, because it incorporated both industry history and ongoing growth and market change. So in response to those comments, IGAS and others submitted comments suggesting that 2020 and 2021 data should be considered. EPA considered those comments but decided that both years were atypical and declined to include them. This is the definition of arbitrary and capricious arbitrary action because for 2020, there was no substantial basis in the records, no factual basis for EPA's conclusions. So I thought that they said that there is evidence of stockpiling, which distorts the market shares. And even though the aggregate amount was similar, you would have expected it to be different based on the pandemic, etc.? That is exactly what the EPA did, Your Honor. But we don't believe that was evidence. We believe those were just assumptions made by the EPA, and I'd like to address that. So EPA based its conclusions on market data regarding supply and import over the years. We recreated the chart in page 17 of our brief that shows that data. And what it shows is for 2017-18, supply increasing, imports increasing. 19 levels off 2000 decreases. Now, if you were going to see stockpiling, as EPA acknowledges, you would expect to see an increase in supply, an increase in imports. Companies would be bringing more in. The data does not show that. So EPA then backed into its conclusion that they were stockpiling by saying, well, we think the data would have shown higher imports, but for the COVID pandemic and supply issues, associated supply issues. But again, there was no facts. There was no facts to support either the stockpiling or the COVID assumptions. Well, if I could ask you about that. The agency said the agency has reviewed updated GHGRP data through 2021 and notes that both the net supply of AIM listed HFCs and the imports of AIM listed HFCs increased at rates that are unlikely to be explained as changing business models to meet increased aftermarket consumer demand. So they're assuming that it's stockpiling. And then they later say the commenters have provided no evidence, including explanations of their own business plans, that could attribute this type of growth due to demand and is the agency's view that changes to business models were a response to the AIMS Act's pending restrictions on production and imports of regulated substances. So even if you disagree with this, this isn't arbitrary and capricious. They thought about it, they looked at the comment, and they believe that this is what happened. And then the commenters didn't give them data to the contrary. Well, Your Honor, if I could address that. The quote that you just read is based upon the significant increases of supply in 2021. And there were. Supply almost doubled in 2021. And EPA attributed that to stockpiling. We aren't questioning the EPA's decision not to include 2021. There was data that they based it on. Well, our argument is there was not similar data for 2020. In fact, those two years show marked differences. 2020 imports went down. 2021 almost doubled. So if parties were stockpiling in 2020, you would have expected to see the same thing. And blaming it on the COVID pandemic just isn't rational because the COVID pandemic extended through 2021. So any supply chain problems would have had the same impact in 2021. EPA actually used the stockpiling to reach the same conclusions about very different data for 2020 and 2021. So I guess it said, I'm looking at, I want to give you where I am. Well, it's 46845 of the Federal Register. But after it talks about 2021, it says, by commenters' own views, if import activity in 2020 when compared to 2019 were representative of changing business models, where the net supply, including imports, of HFCs decreased slightly, one would expect, within reason, a subsequent increase in imports between 2020 and 2021. I guess they're talking about 21 then. And that's exactly what they said. We think there was stockpiling, so we should have seen an increase, but we didn't, so we're going to blame it on COVID. And again. But they also, EPA does identify a bunch of market participants reporting supply problems because of COVID. Yes, and there were some, and we don't dispute that. And in 2020 also. In 2020 also. But there was no evidence that it distorted. So that you can't dispute, that there were supply chain blockages in 2020. We don't dispute that there were problems in 20. Those continued in 21 because the pandemic obviously continued well through 21. But what there is. Is that right, though? I mean, I think part of the, I mean, maybe this is the answer because I'm not sure it's explicit, but the nature of the pandemic was abrupt changes, and then by 2021, there's adjustments being made that might resolve some of these supply chain issues. Why isn't that a rational explanation? I think there were a lot of those adjustments made in 2020 itself. If you look at the individual data for 2020, a lot of the importers had significant increases in supply in 2020. They were able to overcome these challenges. And also, the first part of 2020 wasn't affected by the pandemic at all. It wasn't even declared a pandemic until mid-March. So I understood part of the rationale to be based on exactly what you just said, which is put aside stockpiling, but the pandemic essentially scrambled the otherwise natural state of the market so that some companies did well for reasons related to supply chain. And we just don't want to credit those developments in our allowance allocations. Why is that an unreasonable view? Because every year, every company faces different challenges, and some overcome it and some don't. EPA certainly isn't digging into the data every year to see why one company does better than another. That's why it adopted the averaging approach. But that precisely supports EPA, or arguably supports EPA. If EPA is not digging into the data every year, but using data that it thinks is more typical of the arc of the market over time, then it's more strongly supported to exclude a year that I think anybody trying to procure anything in an international supply chain knows was atypical. Well, that alone seems to be a reason to say, you know, whatever, balance it out. It's just that was atypical. We're just not going to include that data. It's a decision based upon speculation, in particular how the supply chain issues affected this particular product for the entire year of 2020. But even your client acknowledges that there were supply chain problems in 2020. But my client also, or our client also, managed to increase significantly its supply during that year. Right. So it overcame those challenges. But that overcoming of those challenges, I think the implication of the record is that that, too, was atypical. And we're just going to treat that as a one-off in a system where, as you point out, the EPA is not every year doing a recalculation. I think the EPA has to have some factual basis for the decisions it makes. And just when you look at the data, it does not support the conclusions. But your position seems to boil down to it was arbitrary and capricious for the agency to say that the pandemic year, 2020, the data was not representative. That's right, Your Honor, without some factual basis for that, which we do not believe is in the record. In terms of even the incentive for stockpiling, you've got to look at the timing of the AIM Act. The AIM Act wasn't passed until the end, December 22 of 2020. The HFC allowances, the whole section was added that very day, the day the AIM Act was passed. But there was a lot of activity starting in January. There was activity. There was activity. Signaling to the market that this was coming. There was activity, actually, if you go back to 2016 when the Kigali Amendment was passed and various companies agreed to phase down HFCs this year. And EPA recognized that. It recognized that there could have been years, especially after 2016, when entities were stockpiling. It chose to include those years in the methodology anyways, again, looking to the averaging to smooth out any anomalies. And the hallmark of the decision is the inconsistency in the treatment between those prior years and the decision to exclude 2020 and its treatment of 2020 and 2021. Can you address the argument that EPA emphasizes in the brief and in the rule is this distinct argument about continuity and that it's mainly on JA346, but essentially it says EPA believes that supply chains have been adjusting to the entity-specific allocations, and so if we make big changes, that's going to result in increased costs and price spikes. And so could you just address that and explain why that is not a separately sufficient basis? Very good question, Your Honor. It certainly was a big theme of EPA's, the desire to mean continuity, the status quo during the phase-down process. But continuity and status quo shouldn't trump the objective of the AIM Act, which was to phase down the use of this product while also meeting near-term market needs. And what the EPA did by excluding 2020 actually has the more disruptive effect on the market here. What EPA didn't recognize is that markets have been changing. HFCs were initially really used by the big manufacturers 2011 to 2013 timeframe. That's when they had their big years. As that refrigerant equipment started to age, there was increased demand for product to serve the aftermarket, to service existing aging units. So by allocating as it did, including 2011 to 2019, all the big manufacturers had their big years early, 2011 to 2013. That set their three-year high. They, therefore, ended up with really large allocations. In 2024, they got 60% of the allocations. Many of those went unused because their markets, their models, business models have changed. They were looking for alternatives. So over $5 million of unused allocations in 2022. What that caused was not enough allocations to meet demand, especially the demand for the aftermarket. It creates an artificial scarcity. You've got unused allocations and then suppliers seeking to serve the aftermarket who cannot get the supply they need. All right. We are going to give you reserved time for rebuttal, but we're going to move on now and hear from you. Thank you, Your Honor. Thank you. And next we hear from Ms. Brown. Good morning. May it please the Court, Jeanette Brown on behalf of Petitioner RMS of Georgia doing business as choice refrigerants. I'd like to resolve three minutes for rebuttal. The AIM Act's complete lack of a standard to constrain EPA's power to create and destroy market share is exceedingly unique, justifying the rare finding that Congress divested itself of legislative power. The standard that EPA claims to have found in the AIM Act does not exist in the text and was not in the purpose or the context of the AIM Act either, as recognized by EPA during rulemaking and its conduct and statements therein. Ultimately, Section E3, subsection E3 of the AIM Act, is an unconstitutional divestment of legislative power. In your view, what should Congress have done to avoid this problem? In our view, Congress should have provided a standard for allocating, for how the allowances would be allocated. So in your view, they had to spell it out, like with a formula or something? No, absolutely not. They did not have to spell it out. They had to merely set a standard. This case is different from other non-delegation cases that this Court has faced or that the Supreme Court has faced in our lifetime. There is no standard in the AIM Act specifically related to the power to grant or take away market share, to the liberty to destroy the liberty of acting in the market. All regulations affect liberty, right? That's correct, Your Honor. So why is this one somehow different? This one is different because if you look at American Power & Light, if you look at Lichter, if you look at any of the prior non-delegation cases, there was a standard, a primary standard, that was set for Congress for the exercise of the power. It is that standard that prevents the power from being legislative when it's granted to an agency. That standard does not have to be definitive. It does not have to be concrete. It does not have to be a formula. So, for instance, it would be... So looking at the context and the structure of this particular statute, we can also look at the legislative history. Is that correct? Well, it's an interesting question, Your Honor, because I'm not sure there is legislative history specific to this very... Well, there was legislative history saying that this is very similar to the Title VI of the Clean Air Act cap-and-trade program. There was repeated statements that this is modeled after that, this is related to that, and in that Title VI program, the EPA set the initial allocations based on market share. Well, Your Honor, if you look at Title VI, number one, Title VI itself in the statute provides that the phase-out of the Class I substances are going to be by market share. That's not something that the EPA put in by regulation. Where does it say that in the Title VI legislation? We took a look at this, and I didn't see that. It says that, Your Honor, for example, at 42 U.S.C. 7671C, subsection A refers to production phase-outs, and it specifies that the phase-outs and the limitations apply to the substance produced by the person concerned. In other words, the producers are subject to these caps. So isn't every phase-out by definition phasing down? People who are using it now have to use less? No, that's absolutely not true. And if you look at the EPA's statements in the rulemaking, the EPA proposed and has consistently proposed, sought advance notice or comment on, and suggested that it can change completely the allocation method to use an auction that would allow them to sell allowances for the purposes of non-use. Wait, wait, wait. But that's not the program before us, and that's the view of the agency. But what we're looking at is what the agency did and whether there's an intelligible principle in the statute. What you're looking at, the agency... Do you agree that what we're looking for is whether there's some intelligible principle in the statute that guides EPA's grant of allocations? I agree that the intelligible principle standard requires... I'm sorry, allocation of allowances. Yes, Your Honor. I agree that the intelligible principle requires Congress to set a standard for the allocation of allowances here because of the way that it affects liberty, and to set a primary standard. It doesn't have to be the full standard. They don't have to spell it out, but they have to set a standard. And there was a standard in the ozone-depleting substances and the provision that you were just discussing with Judge Pan, right? There was a standard in the prior statute. And in the rulemaking and in all of the comments, EPA explains why that standard is not applicable here. The two statutes are very different in that under, for example, the Clean Air Act and the phase-out of the Class I substances, there were exemptions rather than priorities. There was the requirement that it be by company, which wasn't here. There were a lot of other differences between the Clean Air Act, and the EPA specifically noted that it had the power to apply allowances, to apply a completely different allowance methodology here because of those differences between Title VII and the AIM Act. Oh, go ahead. I just want to go back to what would be a sufficient standard. So imagine that E3 said EPA shall allocate allowances in a manner that accomplishes this phase-down in an orderly way. I think that Congress could have said they shall allocate the phase-down in accordance with pre-existing markets to share, but they didn't do that. My hypothetical was this statute prescribes exactly the phase-down that's to occur, and it prescribes the manner, essentially a cap-and-trade system, and what's left unanswered is how to allocate the allowances, on your view. And my question is, what if it had just said, allocate the allowances in an orderly way to accomplish the phase-down that we have prescribed? I don't think that would be sufficient, Your Honor. I think that would be comparable to saying allocate the allowances in a way that's not arbitrary and capricious, and that itself does not provide an adequate standard. If you look at the requirements of Panama refining, if you look at the requirements of YACAS, if you look at the requirements of cotton mills, the standard, Congress has to set a standard, and it has to be one where Congress, the courts, and the regulated people, as well as the public, can determine whether or not the agency is acting in accordance with not just a policy, but with the standard that has been set by Congress. So can you, I appreciate that argument, how would you have us distinguish the Sanchez case? So that's a decision from our court that involved authority to prescribe regulations for childcare centers. And on my read, there was certainly not an explicit standard in that case. Are you familiar with that case? And if you are, how would you suggest that we distinguish it in our opinion? Yes, Your Honor. At the end of the day, to your point, the question of whether or not there's an intelligible principle is a point of statutory interpretation. So in the Sanchez case, in interpreting the statute at issue, the court found that there was an appropriate standard. It's similar to, for instance, American Power and Light and Lichter, where there is an extensive common law background that provides established meaning to what would otherwise be vague statutory terms, such as excess profits or inequitable distribution of market share. Here, there is no established common law background or practice for the United States to have an agency distribute, take, and grant and ban people from a market. I'd love to hear your response. I mean, I appreciate that, but isn't it kind of analogous that there was the ozone-depleting substances statute? And yes, there are express differences, but the basic tenet, the one that you're pointing to that would have been adequate, allocate by market share to existing market participants, that was a core also of that program. So why isn't it something that Congress is aware of? And then when Congress shorthands by saying, you know, market allocation, you know, allocation of permission to use these substances, why isn't that kind of part of the common law background or here the statutory familiar background? Sure, Judge Pilgrim. Actually, I would refer to your dissent in the prior Harding case where you reasoned appropriately that when Congress doesn't provide a specific standard, it's not a prohibition. It is a permission. It is leaving it to the agency. It is leaving that power to the agency to give the agency flexibility. And so the fact that Congress here incorporated certain sections of the Clearing Air Act but did not incorporate the substantive provisions relating to market share should be viewed as Congress leaving it to the agency to decide how to do it, consistent with your prior reasoning, Your Honor. I see I'm out of time. I would like to just address the severance issue. Very briefly. Yes, Your Honor. For the reasons stated, subsection E3 is unconstitutional. It is an unconstitutional grant or divestment of legislative power. Subsection E2 of the AIM Act is not severable from subsection E3, and therefore any part of the final rule that derives either from subsection E3 or subsection E2 should be reversed. So I take it that invalidating E3 while leaving E2 in place would only exacerbate your injury. Not necessarily, Your Honor. As we argue in our brief, my client is a reclaimer, so our client would be able to reclaim some of the products. Also, our injury is a competitive injury, and so it would put us on an evenly playing field with all other persons using consumption allowances to rely on existing stockpiles. All right. Thank you. Ms. Buckley?  Good morning, Your Honors. May it please the Court, Sarah Buckley for the Environmental Protection Agency. With me at council table is Karen Bianco of EPA's Office of General Counsel. The AIM Act sets out a detailed scheme that establishes Congress's policy ends, means for achieving it, and specific deadlines for executing on those means. And specifically, that is that Congress is seeking to phase down the production and import of specified hydrofluorocarbons using an allowance allocation and trading program that would achieve a graduated step-down on a specific schedule. Giving EPA the authority to determine how to allocate allowances within that detailed scheme was not a delegation of legislative authority. And EPA's decision to continue using 2011 to 2019 data to determine those allocations was reasonable. So how would you, when it comes to the method for allocating, how would you describe the intelligible principle that the AIM Act gives to the EPA? Right. I think the intelligible principle here is that EPA has to ensure that entities engaged in the activities that are going to be prohibited, the production and import, are given a chance. Those allocations, those allowances should make it into their hands. So that's one. And then the second, that it has to be allocated in a way that's going to further the broader policy design of the program. So it's got to be hitting the graduated phase down, not exceeding it too much. It's got to be getting things into the hands of entities that are going to use them and not relying completely on trading, for instance. And that that broader structure gives sufficient direction under the Supreme Court and this Court's precedents. Would part of what you just said suggest that there's not authority to do a pure auction, that you have to be getting them into the hands of people who will actually use them? Yeah. I think that EPA would concede that, Your Honor. And, in fact, when EPA proposed potentially or considered the possibility to not actually propose using an option, it noted that it would use an option to get it to those producers, importers. The participants in the auction may be those same entities receiving allocations. So are you, just to make sure I'm understanding you, are you saying that it would have authority to use an auction as long as the auction was limited to market participants? Yes, Your Honor. I think that Choice is getting three important things wrong in their briefs in here today. First is the standard that applies. As we've been discussing, the standard that the Supreme Court has applied since 1925 in J.W. Hampton through 1989, Mistreta, Sanchez, 2022, is that Congress articulates a sufficient intelligible principle and does not then delegate legislative authority if there's a general policy, an agency to apply it, and boundaries on the delegated authority. In their briefs, Choice suggests additional limitations on that authority that is refuted by existing established Supreme Court law. So, for instance, agencies can issue rules governing private conduct. The Court affirmed just that grant of power in a case like Yackas in 2B regarding criminalizing new drugs. Agencies can articulate policy beyond just finding facts that the statute makes dependent on that. And I think that a case like National Broadcasting Company is a good analogy to what we've seen here. So, in National Broadcasting Company, Congress articulated a policy that they wanted greater propagation of radio licenses. They wanted to use a licensing model as the mechanism for achieving that means, and then it gave the broad mandate that the executive should distribute those licenses in a way that furthers the public interest, convenience, and necessity. I think here we have even further specific direction than we had in National Broadcasting Company because we have the specified phase-down schedule, we have the graduated step-down, we have specific conduct, we even have the application-specific mandatory allowances, and a program or a process for EPA to be able to designate additional essential uses that should receive all the allowances they need. Ms. Brown, why did the application-specific allowances and the procedure for designating additional such entitlements help when the question is for the remaining pool, what is the intelligible principle for allocating those allowances? Well, I think that that's taking the question that's presented at too narrow an area of focus because really the question is, is there an intelligible principle for EPA to administer, to promulgate regulations to administer the Allowance Allocation and Trading Program? And Congress made clear that its priority in doing that, its policy for the allocation of allowances, was please ensure that these specific listed applications receive all the allowances they need, regardless of the phase-down level that we're at. If you find there are additional uses that need that, you have a system for designating that. And after that, the agency is given the discretion to administer the statute and figure out the best way to allocate the remaining allowances in a way that furthers the statutory purpose and meets all the various other policy design elements. So what is the statutory language that provides the limiting principle, in your view, other than the application-specific allowances that are secured? Yes, Your Honor. E3 says that EPA is to promulgate the regulations in accordance with this section and in accordance with the phase-down schedule. So if you see in accordance with this section, you go back, what is the section doing? The section prohibits the import or production of these substances without an allowance. And I think it's fair to say, based on that, that Congress was intending EPA to get those allowances into the hands of entities that needed it for the prohibited activity. And I think a useful thought exercise on this is this. If EPA had gone out on Pennsylvania Avenue and handed out allowances to the first thousand people that walked by, or if EPA had allocated allowances to, say, the pool noodle industry, we would think that's contrary to the statute. And that instinct, I think, is evidence of the intelligible principle here. Why is that? Well, EPA was directed to ensure that the phase-down is achieved on a specific schedule, assuming the other policy design elements expressly written into the statute. And then it has the administrative task of making sure that allowances go out to achieve that statutory scheme. Do you think the word phase-down implies, sort of by market share, because it seems to imply everybody who's doing this now needs to phase down or needs to cut their production or consumption? I do think that that would make EPA's scheme here a reasonable exercise, right, a reasonable interpretation of the task that Congress gave it here. I think it's also important to note, speaking somewhat to Choice's last argument on the severability question, that Choice today and Choice in their brief notes that E3 is structurally inseparable from the rest of the Act. And I think that that, again, shows that this last piece of discretion in the policy structure that EPA was given is confined by the broader policy structure that makes up the whole scheme that Congress set out. So I think you've answered this, but could EPA issue allowances by auction and allow environmental groups to purchase the allowances with express plan not to use them? We don't think that would be the best interpretation of the statute, Your Honor. Not a permissible interpretation. We don't think it would be the best interpretation to assume. Maybe that doesn't matter anymore. And I think a couple of places to point there is, one, there's an express provision in the statute saying the process by which EPA can accelerate the phase-down. And, in addition, there's an assumption that when you trade an allowance that – or not assumption, there's a provision in the statute that when you trade an allowance, you actually have to achieve a greater reduction. So, again, there's an assumption that the allowances are going to get primarily into the hands of the people who are going to use them to meet near-term needs. And is there anything in the statute that guides whether the agency could issue all the allowances to domestic HFC producers as distinct from importers or vice versa? Right. I don't think that there is anything in the statute on that point, Your Honor. But I think that that would be policed by other doctrines such as the EPA's arbitrary and capricious standard. I don't think that we need to make non-delegation the ultimate test against which the lawfulness of agency action is measured. The non-delegation doctrine is intended to police the outer boundaries of the separation of powers, and that is in part why the standard is articulated pretty broadly, right, policy and boundaries. I was going to ask about the IGAS issues. Yeah. Is that all right? Yeah. I understand you have several different rationales for excluding 2020 and 2021, but just on stockpiling, it is a little bit striking that every single time EPA discusses this in the rule, it says there's a lot of evidence of stockpiling in 2021, and there's no reference that I could find to data showing stockpiling in 2020. Why shouldn't that concern us for that specific rationale? I think for two reasons. One is the effects of the COVID-19 pandemic are a separate rationale that fully justifies excluding that data. And second, it speaks to our exhaustion argument here, is that IGAS nor any other commenter specifically said, hey, let's treat 2020 differently. And I know that sounds silly, but the argument in the brief that IGAS made was that EPA ---- It kind of does sound a little silly. Frankly, it's a little surprising to me, right? You invite comment, should we include 2020 and 2021? And the forfeiture argument you're making suggests that it just never occurred to you to think about whether the reasons you had for excluding one year also applied to the other. I think the force of the argument is maybe this. IGAS said that EPA failed to independently consider 2020. To the extent that's their argument, our response is, you didn't tell us to independently consider 2020. But more importantly, you didn't give us the data that you ---- the level of data that you now say EPA needed to have analyzed in the record to make EPA's point. And as noted before in the earlier argument, EPA said that nobody gave any business plans or other explanation for the import activity in that very unusual year, 2020, that would have explained that. And EPA is concerned by the overall principle that ---- But would have explained what? Because I guess the point is, their point is, there doesn't seem to be any anomaly in the 2020 data. And your explanation is, well, stockpiling cut one way and pandemic cut the other way. And that's why it looks sort of normal. And they're saying that's based on speculation. Right. Well, I think that's looking, again, at the aggregate data. Maybe the aggregate data, one, it's not entirely normal because it did decrease after years of increasing year over year, for one. But two, sort of missing the trees for the forest. Because it's the distribution of import activity during that year that EPA feared reasonably was not reflective of the actual market. And note here how the allocation system works. It's only those companies that did better in that unusual year that is ---- who are going to be affected by including that year. Except to the extent, then, that they get a larger share of the fixed pool. So it's this unusual year that EPA doesn't think is reflective of market realities that would then go in and reorder the allocation of allowances. And in your view, do we need to think that EPA actually thought about the entity-specific level? Or just that it's enough to have sort of a reasonable fear that the distribution was altered? Do you need evidence in this kind of a case? No, Your Honor. I think it is reasonable enough for EPA to have supported, I would say, by plenty of qualitative evidence in the record, right? Lots of comments from entities in the market, including comments from IGAS. And I do want to highlight the comments from IGAS on the effect of the COVID pandemic. At JA60, they wrote in their comments, 2020 and 2021 were anomalous as a result of the COVID-19 pandemic where supply chain difficulties dominated all markets. Manufacturing in other countries was curtailed due to the coronavirus. Ships were unavailable and shipments were not unloaded. Imports were very difficult to achieve. So EPA's judgment that those disruptions would make it very unlikely that the distribution of imports in that year was truly representative of the market was reasonable. That it was not truly representative. And given that, it would be a market distortion to benefit those companies that had unusual success during that year. I have a question about the interest in promoting market stability. And I understand your argument about 2020 having been an unusual, atypical year. But is promoting stability sufficient justification for continuing over coming years to leave the allocation formula unchanged? At what point is it not rational to keep giving allowances to legacy equipment manufacturers based on their market share from, let's say, 2011 to 2013? Your Honor, there certainly may be a point at which that is true. And EPA has left the door open to reconsidering its allocation methodology past 2028. Things that it could take into account would be things like whether entities are not using their allowances. Whether the trading is not really working to make sure that those allowances get into the hands of people who need them for their near term needs. But in this particular circumstance, EPA rightly credited commenters' concern that stability was especially important because there had just been two years of a phase down. Supply chains, business planning was adjusting to that phase down right as we were going into the first big jump from 90% of baseline to 60% of baseline. And so surely the additional stability in, importantly, it's the capped market, not the market that exists prior to it. One question I have about this is that if you wanted to promote stability in supply chains, wouldn't you want to know what the supply chains are doing now, more recently? In other words, you're saying that we have to preserve allocations based on data from a decade ago. But in reality, won't the supply chains be, if you had perfect data, whatever they are today, or at least in 2020, 2021, and it's actually going to be more disruptive to shift away from what the market's doing on its own? Well, again, Your Honor, first point is that we have already shifted into the capped market of people adjusting to their proportion of the limited pool of allowances. But, you know, second, this is, I've forgotten my second point. Go ahead. No, I understand. So once this cap, we shouldn't rely on 2020 for stability because once the cap system comes online, that's going to be shaping that. Right. And I think there's a little technical point here just about the data and what the importance of predictability and knowing your share is because all of this market data is confidential business information. Until EPA published the first allocation action where people saw what their high three years were compared to everyone else, they wouldn't have known what their proportion of the pool would be. So maintaining that consistency into the next one to be able to predict the share of the now 60 percent pool was certainly a rational concern. And in the end, you know, this is EPA choosing between potentially reasonable policy outcomes. Right. And the question for the court is whether EPA's choice here was rational. And we think the rule surely makes sense. You had a point about the your forfeiture argument that they that people commented in support of including both years data 2020, 2021. And you said we didn't have the ability to do a more granular analysis of 2020 because they hadn't provided that data. Is that not the agency's burden to ask for that data? I think the point we're trying to make, Your Honor, is that without making specific points and providing, again, company specific information that would allow or indicate to EPA that it needed to more granularly dive into the 2020 data, then it was reasonable for EPA to respond in the more general manner that it did. The notice and comment process is a two way street. You know, EPA's obligation to respond and the detail in which it has to respond has to be in response to the level of detail and the kinds of arguments raised in comment. We ask you to deny the petition. Good morning, Your Honors, and may it please the court. Elizabeth Dawson appearing on behalf of Intervenor Respondents Alliance for Responsible Atmospheric Policy and Air Conditioning, Heating and Refrigeration Institute. EPA's 2024 to 2028 HFC allocation framework should be upheld because Congress lawfully delegated EPA specific limited authority to create an allowance allocation and trading program and EPA lawfully exercise that authority when determining that the best approach was to continue using 2011 to 2019 data in determining allowance allocations. While these few petitioners take issue with EPA's approach, this allocation rule has the support of the vast majority of the entities regulated by it, and it is a crucial step in effectuating Congress's implementation of the Kigali Amendment to the Montreal Protocol and, more broadly, to reducing GHGs. Turning first to the non-delegation argument, petitioner choice makes three fundamental errors. First, myopically focusing on just one provision, 42 U.S.C. 7675E3, to the exclusion of the entire statutory scheme to regulate and phase down HFCs, because that entire scheme provides ample mandatory guardrails constraining EPA's discretion. Second, it errs in maintaining that without any grounding in precedent, that who receives allowances is somehow a crucial missing link that separates lawful delegation of executive authority from unlawful delegation of legislative authority. And third, it errs in claiming that EPA is unilaterally determining what businesses may remain in the marketplace and what businesses may not, for it is the market itself, really, that is determining that. Both Congress's framework and EPA's methodology track the market by looking to historical market share and overall HFC production and consumption. EPA is not picking winners and losers. Petitioner IGAS's arguments fare no better for three reasons. First, EPA's retention of 2011 to 2019 as the appropriate years from which to determine market share was reasonable and reasonably explained. EPA sought comment on adjusting its approach to include 20 and 2021, but concluded that commenters did not provide sufficient reason to change its methodology. The Clean Air Act's rulemaking standards, which are applicable here, require no more. Second, EPA fully explained why it determined that both the COVID-19 pandemic and evidence of stockpiling led to the conclusion that 2020 and 2021 were anomalous years. And third, EPA reached the same conclusion for 2020 and 2021 reasonably, and that does not mean that it improperly lumped the years together. EPA had sufficient reasons for excluding each beyond COVID and stockpiling, including maintaining continuity and stability and predictability for regulated entities, as this court has discussed. So unless the court has any questions, I conclude and thank you and urge the court to uphold EPA's decisions and deny the petitions. I wonder if you can cast any further light on the treatment of stockpiling. EPA acknowledged there was potential stockpiling before it applied that rationale to the 2020-2021 data. In particular, EPA acknowledged that if the data were limited to 2017 to 2019, the knowledge that some kind of HFC limits were in the offing in light of the Kigali Amendment might have already triggered some stockpiling, and therefore the EPA responded by taking the relevant data back to 2011 and having a three-year average system to counteract any non-representative year stockpiling impact. Why aren't those safeguards sufficient to address concerns about stockpiling in 2020? Well, Your Honor, another reason that EPA excluded both 2020 and 2021 was because EPA concluded that its ability to validate the 2020 and 2021 data was not as robust as the set of data and its validation process for 2011 to 2019. Well, does EPA have any reason to think that the data it has from 2020 is unreliable? I mean, that seems a little bit of a self-fulfilling rationale. They've had time. They just haven't wanted to put the resources in to validate that, so I'm not sure that's a compelling... Well, Your Honor, I can't speak to EPA's motivations behind... It just doesn't seem... Do you have any other argument that doesn't strike me as the most compelling? Well, Your Honor, I think the EPA asked for comments on whether it should include 2020 and 2021, so it asked for entities to provide it the data from which it could conclude that 2020 and 2021 were more representative years, but that information simply wasn't provided. And overall, looking at all of the data, and in addition to reasons beyond COVID and beyond stockpiling, EPA reasonably concluded that it made sense to continue with its prior framework rule year span of 2011 to 2019 instead of adding additional years. All right. Thank you. Thank you. Did Ms. Sandifer save any time for rebuttal? Two minutes. All right. Thank you, Your Honors. I'm going to start with the argument that at least several of us here agree is silly, and that is the forfeiture argument. EPA did ask for comments on 2020 and 2021, and the IGAS petitioners responded in like kind. But the crux of what EPA was asking for, and it made clear in its notice, was it was asking for comments on whether to include more recent data. And IGAS consistently advocated for inclusion of more recent data, which necessarily included 2020 and 2021. That argument subsumes including just one of those years, and basically they're faulting us for using an and instead of an or in the comments. Well, is there 2020 specific data in support of the comments on which the challenges rely? In other words, do the comments enable the disaggregation that you say should obviously have been on the table? Yes, Your Honor, they do, because even in the proposed rule, what EPA was looking at was the aggregate supply data for those years. It had, and this is really important, I think, to the waiver argument and to the crux of it, it was that EPA had the opportunity to consider the years separately, because it looked at the years separately. It looked at annual import and consumption data for 2020 and annual import and consumption data for 2021. Totally separate frames of reference. So I came into this argument kind of agreeing that this was kind of silly, because people will often make several arguments in the proceeding below and then come up and just challenge one of them. But the way this argument has played out, EPA is saying, you never asked them to independently look at 2020. And then as this argument is played out, it's like one can see or imagine a scenario where you come in saying, look at 20 and 21. And then the final rule comes out, as it did here, and it focuses more on 2021. So you come in and say, aha, you didn't consider 2020 independently. If you had asked them to consider 2020 independently, maybe we'd have more information in this record about 2020 as opposed to 2021. But since you never asked them to, it does seem to me a little unfair for you to come in and just say your final rule only focuses on 2021 and didn't look at 2020 independently. I don't think that's the case here, because we did consistently ask consideration of more recent data, which includes both of those years. And the data that was relied on was independent data for those years. In other words, EPA had the same data for 2020 and 2021 that it based its decision on. It didn't look at individual data for individual entities. It looked at the aggregate supply data and reached this conclusion about stockpiling for both years based upon that. No, I understand that they could have done this, but you didn't ask them to. And now you're faulting them for not focusing on 2020. We didn't specifically say either or year, but we did ask for inclusion of more recent data, which I certainly believe includes her. You said they had aggregate supply data. Could they have, given what EPA posits were countervailing forces operating in 2020, without more individuated data, can they separate out a stockpiling and a supply chain analysis? Can EPA do it, you mean? Yeah, could EPA do that? Or could the commentators do it? Well, they certainly had to have some basis for the decision they reached in 2020. Right, right, right. No, I get that it's their burden to have a basis, but the interplay here is between the commentator's burden to raise the defect and then whether they can fault EPA for not addressing the defect they raised. I guess the question is, do you think EPA had the data that it would have needed to do more precise attribution of the causes of the aggregate numbers that show up for 2020? For example, as between supply chain problems and putative stockpiling. It didn't cite any data in its report. But do you think it had the data? I can't really speak to that, Your Honor. I don't know exactly what data it might have looked at, but I mean, any data that... You know what data was in the record, no? Certainly, yes.  No, I don't think it was provided. I mean, at that time, I don't know if entities were able to provide specifics about, well, we had stockpiling problems this month of 2020. Or, not stockpiling. We had supply chain issues this month of 2020 and that month of 2020. I don't think it had to go to that level. Because the data that it was defending... I mean, EPA, I guess, specifically did address Judge Pan in 2020 in its comments. It did specifically point out that the data for 2020 just did not support stockpiling. So, there was no reason for it to go further. I mean, if you look at the data and the COVID problems, there wasn't even any stock to pile, for instance, in 2020 because of these problems with... I thought you said that there was no evidence of stockpiling in 2021. I thought you just said that. No, 2020. If I did, I apologize. I'm speaking solely to 2020. In 2021, the data certainly indicates large increases in supply. And that is right on the basis for EPA's ruling, and we aren't challenging that. But 2020 is a very different situation. And EPA chose to base its decision on the aggregate supply data. And it just does not support the decision it reached. Great. Thank you. Thank you very much. Ms. Brown has reserved three minutes for rebuttal. Thank you, Your Honor. I think it's important to pay attention to the arguments that the interveners made, and particularly that they stand up and say the majority of the industry supports this. But that highlights the importance of the separation of powers, of the divesting of powers in the executive branch. This isn't about majority rule. This is about the legislative process. They also said that it's a narrow issue as to who will have the allowances granted. That is not a narrow issue. That is the decision that brings this act home to the people in the marketplace and to others. It is the decision as to who will be allowed to do business and who will not. And in Rodriguez v. United States, the Supreme Court specifically said that citing what competing values will or will not be sacrificed in the achievement of a particular objective is the very essence of legislative choice. Here, EPA exercised that choice when it decided how to grant allowances. Also, three quick points in response to the government's arguments. First, the standard has to relate to the power. In other words, if you look at, for example, Panama refining and even Gundy, what was important in Panama refining was the transportation of hot oil, essentially oil in excess of state limits. The court said we look to the statute to see whether or not there is a policy and a standard as it relates to the subject of that power. Here, the subject of the power is issuing or withholding allowances, banning people even from the marketplace. There is no standard in the AIM Act in its text, in its purpose, or its context. But no one's banned from the market because they can still buy. They can trade and buy these allowances. Yes, but you don't have to buy at liberty. The fact that you can buy your trading allowances doesn't mean that there wasn't a constitutional violation. You can buy your way out of jail if you're submitted there in violation of your constitutional rights. That doesn't mean there wasn't a constitutional violation. And EPA recognized in rulemaking that it creates a disadvantage to smaller companies. Ms. Brown, you were about to talk about Gundy, and in some ways this case feels quite similar to Gundy, where the principle there was to get the pre-act offenders registered as quickly as possible in an orderly manner. And that was actually not ever spelled out in the statute. And here, similarly, one might argue that there's an implicit principle that the baseline references the existing market, existing market participants, and the desire to not be disruptive implies a principle of treating the status quo as the baseline and then using an allocation that reflects that baseline as the starting point for the phase down. So why isn't Gundy pretty strong support for what EPA did here? Well, number one, if you look at Gundy, what the Supreme Court said in Gundy was you have to look at the task that was assigned and the instruction given as to that task. Here there are no instructions given. And the reason that you can't fall back on the ODS, if you look at what EPA did here, and one thing that hasn't come up in argument this morning is the set-asides that EPA made in the consumption allowances for new market entrants. So in other words, even as it relates to consumption allowances, which is what my client uses, EPA decided that it was free to set aside over 7 million allowances, more than my client receives, for new market entrants. And while EPA here disclaims the ability to use an auction, I suggest that that's a litigation-driven post hoc rationalization. But that's not before us. That's not before us because they haven't used an auction. What we're looking at is whether they subjectively appreciate it or not, whether we see what they did as bounded by an intelligible principle in the statute. No? We cannot look at what they did, and I think that Whitman makes that clear, because EPA cannot save an unconstitutional statute by the actions that it takes. Whatever standards EPA supplies here don't change the fact that the statute either does or does not give an intelligible principle. That's a slightly distinct point. I mean, in the Gundy-type situation where, I guess you don't see the analogy, but where there's a task, which there is getting people onto a registry here, it's running an allocation system that will allow the EPA, according to the statute, to push down the levels on the schedule that Congress set. That's the task, and that's what the allocation is tailored to accomplish, just as the speedy signing up of the pre-act offenders was the task in Gundy. But I think, Your Honor, if you look at Gundy, it is a question of statutory interpretation. So in Gundy, the Supreme Court looked at SORNA and said, if we look at this statute, and particularly if we look at these parts of the statute, and we look at the legislative history, those other parts of the statute say that you had to do this as soon as possible. That power wasn't reserved to the Attorney General in that case to either do or do not register pre-existing offenders. Here, when you look at the AIM Act, and you have to look, again, at the set-asides, and also look at the application-specific allowances, the fact that there's a general pool is a creation of EPA's making. And so when you look at EPA's rulemaking, even on the application-specific allowances, EPA said there is nothing in the statute that identifies who's to receive these, and they gave them to the end users. They created an opportunity for new market entrants. And so there's nothing that EPA saw in this statute prior to this case that restricted granting allowances to pre-existing importers or producers as it now claims, and the final rule should be reversed. Thank you very much. Case is submitted.
judges: Pillard; Pan; Garcia